United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 10, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 20-33948 |
| FIELDWOOD ENERGY LLC, *et al.*, | § | |
| | § | CHAPTER 11 |
| Debtors. | § | |
| | § | |
| QUARTERNORTH ENERGY LLC AND CERTAIN OF ITS AFFILIATES, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | ADVERSARY NO. 20-3497 |
| VALERO MARKETING AND SUPPLY COMPANY, | § § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION

QuarterNorth and Valero dispute whether Valero can succeed on its breach of contract claim. The parties filed opposing motions for summary judgment on the issue of whether Valero is entitled to recover damages. For the reasons set forth below, QuarterNorth's summary judgment motion is granted. Valero has no claim against QuarterNorth and owes QuarterNorth $2,102,544.00, plus attorneys' fees, costs, and interest.

## BACKGROUND

In June 2018, Valero, a refiner and marketer of petroleum products, entered into a contract to purchase crude oil from Fieldwood, an upstream oil and gas operator and producer. (ECF No. 1-1 at 2). The parties agreed that: (1) Fieldwood would deliver approximately 10,000 barrels of crude oil per day[1] with a "tolerance" of "per actual production about 49.5 percent of Noble's

---

[1] The contract says "620,000 barrels." (ECF No. 1-1 at 2). Fieldwood alleges this was a mistake, and the contract should be for 310,000 barrels a month. (ECF No. 15-1 at 3).

share"[2] of the Big Bend and Dantzler fields; (2) price is variable according to various market rates for crude oil;[3] (3) the contract continues until one party cancels with thirty days' written notice; and (4) Texas law governs. (ECF No. 1-1).

Fieldwood delivered 195,000 barrels to Valero in April 2020, averaging 6,500 barrels per day.[4] (ECF Nos. 15 at 4; 17 at 3). Because of low prices for crude oil, Fieldwood decided to temporarily shut in the wells associated with the Big Bend and Dantzler fields in May 2020. (ECF No. 15 at 2). As a result of temporarily shutting in the wells, there was no output. Fieldwood informed Valero that it would not make any May deliveries on April 27, 2020. (ECF No. 17-3). On April 29, 2020, Fieldwood sent an official notice terminating the purchase contract effective May 30, 2020. (ECF No. 17-5). Valero sent a demand for adequate assurance on May 14, 2020. (ECF No. 1 at 9). Fieldwood did not give adequate assurance and delivered nothing in May 2020. (ECF No. 17 at 4).

Under the contract, Valero owes $3,090,564.29 for the April 2020 delivery. (ECF Nos. 15-3; 17-2). Valero only paid $988,020.29. (ECF No. 17 at 4). Fieldwood filed this adversary proceeding to recover the unpaid $2,102,544.00 on December 11, 2020. (ECF No. 1 at 3). Valero asserted a counterclaim for breach of contract on January 15, 2021. (ECF No. 4 at 7). Valero acknowledges that it owes Fieldwood $2,102,544.00 for the April 2020 delivery, but maintains

---

[2] Noble was Fieldwood's predecessor in interest. (ECF Nos. 15 at 4; 15-1 at 2–3). Therefore, Noble's 49.5% share became Fieldwood's 49.5% share.

[3] The contract price is the average of WTI NYMEX for the month of delivery, plus the Thunder Horse Argus Differential for the trade month, plus the Argus WTI Differential to CMA NYMEX for the trade month. (ECF No. 1-1 at 2).

[4] Fieldwood alleges that its share from the Big Bend and Dantzler fields produced an average of 9,987 barrels per day for the period of March to June 2018. (ECF No. 15-1 at 3). Fieldwood delivered between 195,000 and 322,400 barrels per day for the period of July 2018 to April 2020 with zero barrels delivered for the month of February 2019. (ECF No. 19-3).

that it is entitled to market damages of $3,118,600.00 for Fieldwood's non-delivery in May 2020.[5] (ECF Nos. 17-7 at 2; 17 at 5).  After offsetting the unpaid $2,102,544.00, Valero believes that Fieldwood owes it $1,016,056.00.  (ECF No. 17 at 5).

Before conducting discovery on damages, the parties agreed to file cross-motions for summary judgment on the issue of whether Valero is entitled to damages.  (ECF Nos. 6 at 3; 15 at 1; 17 at 6).

QuarterNorth acquired Fieldwood's interests in this adversary proceeding on August 27, 2021.[6]  (Case No. 20-33948, ECF Nos. 2013 at 553; 2016).  The Court entered an order substituting QuarterNorth as plaintiff in this adversary proceeding on October 27, 2021.[7]  (ECF No. 29).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Proceedings affecting the debtor-creditor relationship are core proceedings under 28 U.S.C. § 157(b)(2)(O). Venue is proper in this District consistent with 28 U.S.C. §§ 1408 and 1409.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing an absence of evidence supporting an essential element of the non-movant's case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

---

[5] On November 25, 2020, Valero filed a proof of claim in Fieldwood's bankruptcy case for $3,118,600.00.  (ECF Nos. 17-7 at 2; 17 at 4).

[6] August 27, 2021 was the effective date of Fieldwood's bankruptcy plan.  QuarterNorth acquired various of Fieldwood's assets and interests on the effective date.

[7] For the balance of this Opinion, the Court will simply refer to QuarterNorth on matters on which QuarterNorth is substituted as Plaintiff.  Because QuarterNorth stands in Fieldwood's shoes as plaintiff, this convention is followed even on matters originally asserted solely by Fieldwood.

A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, a court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentations of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. FED R. CIV. P. 56(c)(1). A court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). A court should not weigh the evidence. *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible as evidence. FED. R. CIV. P. 56(c)(2). Moreover, a court is not bound to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the

absence of a genuine issue of material fact." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322-24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Even if the movant meets its initial burden, the motion cannot be granted if the non-movant establishes a genuine issue of material fact.

## DISCUSSION

Under Texas law, a breach of contract occurs when a party fails to perform an act it explicitly or implicitly promised to perform. *Gaspar v. Lawnpro, Inc.*, 372 S.W.3d 754, 757 (Tex. App.—Dallas 2012, no pet.) (citing *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 299 (Tex. App.—Dallas 2009, no pet.). The elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018); *Gaspar*, 372 S.W.3d at 757. Under the present facts, the third element is dispositive.

I. **BREACH OF THE CONTRACT BY THE DEFENDANT**

A court's primary concern in construing a written contract is to ascertain the parties' true intent as expressed in the contract. *Valence Operating Co. V. Dorsett*, 164 S.W.3d 656, 662 (Tex.

2005) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)); *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In discerning the parties' intent, a court must examine the entire agreement and give effect to each provision of the contract so that none is rendered meaningless. *Valence*, 164 S.W.3d at 662; *J.M. Davidson, Inc.*, 128 S.W.3d at 229; *see Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) (citing *Coker*, 650 S.W.2d at 393) ("No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."). The terms of the contract are to be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence*, 164 S.W.3d at 662; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *W. Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 564 (Tex. 1953).

The parties dispute whether the contract was an output contract or a contract for a fixed amount. An output contract is one in which the buyer agrees to buy the seller's entire output of production. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex. 1996); *Aquila Sw. Pipeline, Inc. v. Harmony Expl., Inc.*, 48 S.W.3d 225, 235 (Tex. App.—San Antonio 2001, pet. denied).

The contract is governed by Texas law. (ECF No. 1-1 at 4). Under Texas law, a contract for the sale of crude oil is governed by the Uniform Commercial Code. *Aquila*, 48 S.W.3d at 234. ("A contract for the sale of oil or natural gas is a contract for the sale of goods under the UCC.").

Section 2.306 of the Texas Business and Commerce Code, titled "Output, Requirements, and Exclusive Dealings," states:

> (a) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

TEX. BUS. & COM. CODE ANN. § 2.306 (West 2009). Section 2.306 is intended to render output and requirements contracts sufficiently definite "as to quantity and enforceable by reading into such contracts a quantity that is the actual good faith output or requirements of the particular party." *Lenape*, 925 S.W.2d at 570. However, § 2.306 only fills in the quantity term when an output or requirements contract does not specify a numeric quantity or does not provide a standard for determining a specific quantity. *Id.* at 570–71 (finding that the quantity for a take-or-pay natural gas contract was sufficiently definite when the quantity was a percentage of the seller's delivery capacity); *see also Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 790 (5th Cir. 1975) (finding that the quantity for a contract for the sale of cotton was sufficiently definite when the quantity could be determined by multiplying the number of acres by the estimated yield per acre with minimal "natural" variation); *Fort Hill Lumber Co. v. Ga.-Pac. Corp.*, 493 P.2d 1366, 1368 (Or. 1972) (finding that the quantity for a contract for the sale of logged timber was sufficiently definite when one party knew the total area to be logged and the number of a certain tree species could ultimately be determined within that area).

QuarterNorth argues that the quantity provision of the purchase contract is sufficiently definite, so § 2.306 does not apply. (ECF No. 15 at 8–9). Its obligation was "to deliver actual production from the Big Bend/Dantzler fields, whether that was more or less than 10,000 barrels per day."[8] (ECF No. 15 at 9). QuarterNorth contends this unambiguously specifies the quantity of its output, so § 2.306 does not apply.[9] (ECF No. 15 at 9).

---

[8] 10,000 barrels per day was not been a strict requirement in the parties' course of performance. For example, QuarterNorth delivered an average of 6,500 barrels per day in April 2020.

[9] QuarterNorth also contradicts itself when it claims that it committed "to deliver all of its share of the daily barrels available for sale from the Big Bend and Dantzler fields." (ECF No. 15-1 at 3).

Neither party disputes that the "tolerance: per actual production about 49.5 percent of Noble's share (Big Bend/Dantzler)" language is purposefully in the contract. It should be given meaning. *Valence*, 164 S.W.3d at 662; *J.M. Davidson, Inc.*, 128 S.W.3d at 229. The tolerance language is not a standard by which the Court can determine a specific quantity because quantity is only determinable after production. This contrasts with "determinable" standards other courts found led to a specific quantity *before* production.[10] *See, e.g., Lenape*, 925 S.W.2d at 570–71; *Riegel*, 512 F.2d at 790; *Fort Hill*, 493 P.2d at 1368.

Valero purchased QuarterNorth's entire output of production: "actual production from the Big Bend/Dantzler fields, whether that was more or less than 10,000 barrels per day." (ECF No. 15 at 9). The quantity term is unambiguous as to the percentage of QuarterNorth's output from the Big Bend and Dantzler fields to which Valero is entitled, but it is ambiguous as to the number of barrels Valero will receive. Because the contract does not specify a numeric quantity nor a standard for determining a specific quantity in advance of production, and Valero agreed to buy and QuarterNorth agreed to sell QuarterNorth's entire output of production, the contract is an output contract governed by § 2.306. In harmonizing and giving meaning to the two quantity terms, the Court finds that "10,000 barrels per day" is an estimate of daily production. This contract is an output contract, and the quantity term must be interpreted through § 2.306. *See Canusa Corp. v. A & R Lobosco, Inc.*, 986 F.Supp. 723, 730 (E.D.N.Y. 1997) ("An output agreement is not transformed into a fixed quantity contract by the insertion of an estimate.").

---

[10] Under *Lenape*, a contract that unambiguously specifies quantity must do so via a numeric quantity or a standard for determining a specific quantity. *Lenape*, 925 S.W.2d at 570 ("Section 2.306 fills in the quantity term only when a contract does not unambiguously specify the quantity of the output of the seller . . . . It does not apply when the contract either specifies a numeric quantity or provides a standard for determining a specific quantity.") (citations omitted). This rule for an unambiguous quantity implies that quantity is "determinable" only if a specific quantity can be determined in advance of production. Otherwise, § 2.306 would never apply: a specific quantity can always be precisely determined after production. While "100% of output" is unambiguous as a standard for determining the percentage of production to which a buyer is entitled under an output contract, it is ambiguous as to the specific quantity of production to which a buyer is entitled.

Under Comment 2 of § 2.306, "the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure. . . . The essential test is whether the party is acting in good faith."  An output seller may vary output, even to zero, in good faith.  *See N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 608 (Tex. 1998) ("A party who seeks to avoid performance of an output contract by having no output . . . may not do so in bad faith."); *Keyes Helium Co. v. Regency Gas Servs., L.P.*, 393 S.W.3d 858, 865 (Tex. App.—Dallas 2012, no pet.) ("[U]nder [Colorado's version of § 2-306], an output contract allows a seller to reduce the quantity produced to any amount, including zero, so long as it does so in good faith."); *Atl. Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541, 545 (1st Cir. 1993) (finding that an output seller's failure to deliver close to the contracted estimate of salvage from a railroad rehabilitation project was done in good faith when the rehabilitation contract providing the salvage was cancelled); *Griffith v. Clear Lakes Trout Co., Inc.*, 200 P.3d 1162, 1171 (Idaho 2009) ("In an output contract, quantity is to be measured by 'such actual output . . . as may occur in *good faith*.'").  *Cf. Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1339 (7th Cir. 1988) (holding that a buyer's reduction in a requirements contract, which has parallels to a seller's reduction in an output contract, was constrained only by the buyer's good faith); *Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355, 364 (4th Cir. 1994) (recognizing that, so long as it acts in good faith, a requirements buyer "may reduce its requirements to any amount, including zero.").[11]

---

[11] A requirements buyer's reduction to zero absent a good faith reason is unreasonably disproportionate. *See, e.g.*, *R. A. Weaver & Assocs., Inc. v. Asphalt Const., Inc.*, 587 F.2d 1315, 1322 (D.C. Cir. 1978) (finding that although a buyer's reduction to zero in a requirements contract is the quintessential "disproportionate amount. . . . the limiting language of Section 2-306(1) does not preclude Good faith reductions that are highly disproportionate to normal prior requirements or stated estimates." (capitalization in original)).  It follows that a seller's reduction to zero in an output contract absent a good faith reason is also unreasonably disproportionate.  *See also* Shelley Smith, *A New Approach to the Identification and Enforcement of Open Quantity Contracts: Reforming the Law of Exclusivity and Good Faith*,

In determining whether QuarterNorth acted in good faith, *Conoco* is informative.[12]  *See Conoco*, 986 S.W.2d at 608–09.  In a normal output contract, "nothing requires the seller . . . to have any output."[13]  *Id.* at 608.  Though a seller is beholden to exercise good faith, a party in an output or requirements contract takes the risk that its counterparty may make good faith variations, including liquidating or discontinuing the business.  *Id.*;  *HML Corp. v. Gen. Foods Corp.*, 365 F.2d 77, 81 (3d Cir. 1966)  ("[G]enerally the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business.");  *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.*, 130 F.2d 471, 473 (3d Cir. 1942) ("[A] seller under an output contract has no duty to have any output.").  So long as QuarterNorth did not avoid performance of its output in bad faith, it properly

---

43 VAL. U.L. REV. 871, 890 (2009) ("Taking the Official Comments into account, the Code would require the factfinder to perform a two-step analysis, first deciding whether a particular increase or decrease was 'unreasonably disproportionate' to the stated estimate or 'normal' quantity, and then deciding whether the increase or decrease was the result of good faith.").

[12] Good faith variation in output contracts is a nebulous concept.  *See Conoco,* 986 S.W.2d at 609 (indicating that the determination of good faith rested on whether the seller acted with "a valid business reason."); *Am. Paper Recycling Corp. v. IHC Corp.*, 775 F. Supp. 2d 322, 330 (D. Mass. 2011) (citing *Atl. Track*, 989 F.2d at 545) ("A party who ceases performance under an output contract for independent business reasons acts in good faith."); *Feld v. Henry S. Levy & Sons, Inc.*, 35 N.E.2d 320, 323 (N.Y. 1975) ("Obviously, a bankruptcy or genuine imperiling of the very existence of its entire business caused by the production of the [product] would warrant cessation of production of that item; the yield of less profit from its sale than expected would not" and "good faith required continued production until cancellation, even if there be no profit."); Stacy A. Silkworth, *Quantity Variation in Open Quantity Contracts*, 51 U. PITT. L. REV. 235, 241 (1990) ("The distinction between decreasing quantity due to lack of orders and merely to curtail losses is not instructive because most decreases in requirements or output will result in and may be dictated by a desire to minimize profit losses."); Victor P. Goldberg, *Discretion in Long-Term Open Quantity Contracts: Reining in Good Faith*, 35 U.C. DAVIS L. REV. 319, 323 (2002)  ("[I]t is clear that 'good faith' does no work.").  An independent or valid business reason appears to be one which has no relation to the contract.  *See Am. Paper*, 775 F.Supp.2d at 330 (indicating that a shrinking industry and "the financial and strategic business interests" of the seller's sole shareholder, and not an intent to avoid its future contractual obligations, were independent business reasons for the sale of the seller's company to a buyer who terminated the existing output contract); Silkworth*, Quantity Variation in Open Quantity Contracts*, 51 U. PITT. L. REV. 235, 241 (1990) ("In light of the pre-existing case law, perhaps the drafters had in mind the frequently stated maxim that a requirements buyer can take less under the contract if that lesser demand is dictated by business reasons (like demand for the buyer's product) which exist independent of the contract.").  If an output seller ceases production for a reason that exists independent of the contract, it has acted in good faith.

[13] The outcome is likely different if an output contract states a minimum quantity.

brought production to zero. *Conoco*, 986 S.W.2d at 608. The burden of proving bad faith is on the party claiming a breach. *See id.* at 608–09; *HML Corp.*, 365 F.2d at 83 ("It follows that since plaintiff claimed a breach it was its duty to prove it, and the burden, therefore, rested upon it to show that defendant had acted in bad faith.").

Valero has the burden of proving that QuarterNorth acted in bad faith. It has put forth no evidence that QuarterNorth's non-delivery was done in bad faith.[14] (*See generally* ECF Nos. 4; 17; 19). Because Valero has not met its burden to prove bad faith, it has not shown that it is entitled to judgment as a matter of law. Its summary judgment motion is denied.

Nothing in the contract required that QuarterNorth continue output. Its contractual obligation was to deliver the oil that the Big Bend and Dantzler fields produced. They produced nothing in May 2020. Therefore, QuarterNorth had nothing to deliver in May 2020.[15] In April 2020, QuarterNorth recognized that it would become uneconomical to continue output with the fall in market price. The contract determines the price Valero would pay through a calculation of three market rates. QuarterNorth did not cease production for the purpose of avoiding delivery to Valero, but because the market prices (over which QuarterNorth had no control) made it the prudent economic decision: "Considering those market conditions existing at the time, rather than being exposed to the likelihood of producing and selling its May 2020 oil at a loss, Fieldwood made the rational economic decision to suspend the vast majority of its company-wide production, including production from the Big Bend/Dantzler fields." (ECF No. 15-1 at 4). This was an

---

[14] Valero contends that QuarterNorth's wells did not blow-out or run dry, but QuarterNorth voluntarily shut-in its own wells because of economic concerns from a "temporary event." (ECF No. 19 at 3). As explained below, this does not mean that QuarterNorth acted in bad faith.

[15] QuarterNorth was allowed reasonable elasticity from the 10,000 barrel per day estimate. It could not deliver a disproportionate amount without a good faith reason for doing so. The Court finds that zero barrels is a disproportionate amount. *See, R. A. Weaver*, 587 F.2d at 1322. Therefore, it must have had a good faith reason for the variance to avoid being in breach.

independent business reason.[16] *See Am. Paper*, 775 F.Supp.2d at 330. Valero has introduced no summary judgment evidence that contradicts this good-faith, market-based decision. Valero took the risk that QuarterNorth would lower its output to zero, which it did in good faith. QuarterNorth's motion for summary judgment is granted. The balance of the issues in dispute are mooted by this determination.

## II.   ATTORNEYS' FEES AND COSTS

QuarterNorth seeks recovery of its attorneys' fees and costs associated with this proceeding. (ECF No. 1 at 11). The contract provides that Texas law governs. Under the Texas Civil Practices and Remedies Code § 37.009, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Under § 38.001(b)(8), attorneys' fees are recoverable against an individual or an organization if the claim is for an oral or written contract.[17]

Here, QuarterNorth made a demand on Valero for the amount it owed under the contract. Valero failed to pay. QuarterNorth is entitled to costs and reasonable and necessary attorneys' fees as are equitable and just. QuarterNorth will need to prove the amount to which it is entitled at a future hearing.

## III.   PREJUDGMENT INTEREST

QuarterNorth also seeks prejudgment interest. (ECF No. 1 at 12). Texas law authorizes prejudgment-interest awards on equitable grounds. *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 188 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Hand & Wrist Ctr. of Houston, P.A. v. Republic Servs., Inc.*, 401 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.]

---

[16] If QuarterNorth were not a party to the output contract, but still was a producer of crude oil, it would have stopped production. This highlights that QuarterNorth ceased production for an independent business reason.

[17] This adversary proceeding commenced December 11, 2020. Prior to September 2021, § 38.001 only provided for the recovery of attorneys' fees from "an individual or corporation." Valero is a corporation, so QuarterNorth may rely on this provision in pursuing attorneys' fees.

12 / 14

2013, no pet.)) ("Texas law provides two sources for an award of prejudgment interest: (1) general principles of equity, and (2) an enabling statute.").

Generally, prejudgment interest should be awarded "absent exceptional circumstance." *Elbar Invs., Inc. V. Prins (In re Okedokun)*, 968 F.3d 378, 392 (5th Cir. 2020) (citing *Joy Pipe, USA, L.P. v. ISMT Ltd.*, 703 F. App'x 253, 258 (5th Cir. 2017)) (applying Texas law). Prejudgment interest is intended to make a party whole by compensating the party for the "lost use of his funds while the case is pending." *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 513 (Tex. App.—El Paso 2018, no pet.) (citing *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986)). To ensure the successful party is made whole, prejudgment interest begins accruing on the "earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Id.* (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998)). The rate at which prejudgment interest accrues "is calculated as simple interest and is based on the post-judgment interest rate applicable at the time of judgment." *Id.* (citing *Kenneco*, 962 S.W.2d at 532). The Texas Finance Code provides the basis for calculating the prejudgment interest rate. *See* TEX. FIN. CODE ANN.§ 304.003 (West 2021) (enumerating applicable post-judgment interest rate calculations); *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 319 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("[P]rejudgment interest in a breach-of-contract action is properly awarded pursuant to section 304.003 of the Finance Code.").

QuarterNorth is entitled to prejudgment interest, as there are no "exceptional circumstances" that justify denying prejudgment interest. Currently, the prejudgment interest rate is 5.00%. TEX. OFF. OF CONSUMER CREDIT COMM'R, 41 TEX. CREDIT LETTER No. 22 (Nov. 30, 2021), https://occc.texas.gov/sites/default/files/uploads/credit-letters/11-30-21.pdf; *see also* FIN. § 304.003(b); *In re Sunnyland Dev., Inc.*, 597 S.W.3d 529, 531 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[E]ach month Texas's consumer credit commissioner calculates the post-judgment

13 / 14

rate that will apply to money judgments rendered during the succeeding month under section 304.003."). Because the Court has no evidence that QuarterNorth gave Valero written notice of its claim prior to this adversary proceeding, prejudgment interest began accruing on the date QuarterNorth filed this adversary proceeding: December 11, 2020. *See Siam*, 544 S.W.3d at 513. The prejudgment interest to which QuarterNorth is entitled is calculated as simple interest accruing annually on the unpaid amount for the April 2020 delivery. *See Foretravel, Inc. v. Star City Coach Works Ltd.*, 9:09-CV-141, 2011 WL 13196207, at *6 (E.D. Tex. Jan. 5, 2011) (citing *Kenneco*, 962 S.W.2d at 531–32) ("The court may . . . award pre-judgment interest using the principles of common law, which . . . accrues at the same rate as post-judgment interest under Tex. Fin. Code §§ 304.003(c) and 304.103, and is calculated as simple interest.").

## CONCLUSION

A separate judgment will be entered after the determination of the appropriate award of interest, costs, and attorneys' fees. The evidentiary hearing on those matters will be on January 24, 2022 at 10:00 a.m.

SIGNED 12/10/2021

_____
Marvin Isgur
United States Bankruptcy Judge